UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
In re:

                                      Chapter 7

      Ideal Mortgage Bankers, Ltd.,
      *a/k/a Lend America, a/k/a Consumer*
      *First Lending Key*,

                                     Case No. 10-79280-dte

           Debtor.
--------------------------------------------------------X
R Kenneth Barnard, as Chapter 7 Trustee
of Ideal Mortgage Bankers, Ltd.,
*a/k/a Lend America, a/k/a*
*Consumer First Lending Key*,

        Plaintiff,

                                Adv. Pro. No. 12-08453-dte

       -versus-

Gateway Bank, FSB; Empower International, Inc.;
Robert Savitsky; Robert Savitsky, P.C.; The Steve
Menna Group,

        Defendants.
--------------------------------------------------------X

**<u>Memorandum of Decision</u>**

*Appearances:*

Kilpatrick, Townsend, & Stockton, LLP
*Attorneys for defendant Gateway Bank, FSB*
1114 Avenue of the Americas, 21st Floor
New York, New York 10036
By: Johathan E. Polonsky, Esq.


Silverman Acampora, LLP
*Attorneys for plaintiff R. Kenneth Barnard, Chapter 7 Trustee*
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
By: Lon J. Seidman, Esq.


Honorable Dorothy Eisenberg, U.S. Bankruptcy Judge

## **Introduction**

On December 21, 2012, R. Kenneth Barnard, as Chapter 7 Trustee for the bankruptcy estate of Ideal Mortgage Bankers, Ltd., filed an adversary complaint seeking, *inter alia*, more than $50 million in damages from defendant Gateway Bank, FSB. On March 6, 2013, Gateway filed a pre-answer motion to dismiss counts 1-8 and 13. On May 10, 2013, Trustee filed his memorandum in opposition. On June 17, 2013, Gateway filed its reply. The last hearing on the matter was held on December 3, 2013, where the Court indicated that it would issue a decision. For the reasons discussed below, the motion to dismiss is denied.

## **Summary of Pertinent Allegations[1]**

The Debtor began its operations around 2003, but most of the events pertinent to this motion and the complaint took place in late 2008/early 2009. Michael Ashley was the Debtor's Chief Business Strategist, and Helene DeCillis was its Chief Operating Officer ("COO"). At all pertinent times, Gateway was the Debtor's primary lender and chief source of funding.

The Debtor was a mortgage loan originator whose business consisted largely of refinancing mortgage loans for individuals. The Debtor utilized a "warehouse lending facility" (the "Warehouse Line") from Gateway as the primary mechanism to fund its loan disbursements. Loan originators often use such facilities to fund 90-95% of their refinancing obligations. The remaining money is generally supposed to come from the originator's own funds. The Debtor was contractually obliged to use the Warehouse Line funds only to pay off its borrowers' pre-existing mortgages in the course of originating new refinance loans, and then to give Gateway "title" to the refinanced mortgage. Accordingly, Gateway would become the new mortgagee and the Debtor would service the refinanced loan.

---

[1] These facts are mostly taken from the complaint, but some facts are taken from the other documents that Gateway cites in support of its motion. These documents are either public record or are referenced in the complaint. Therefore, it is appropriate to consider them in a motion to dismiss.

The Debtor's pre-petition attorney utilized 3 separate accounts to disburse money for these refinancing loans, all of which were funded by the Warehouse Line (the "Disbursement Accounts"). Even though the Warehouse Line proceeds were only to be used to close new refinance loans, Michael Ashley diverted at least $7,425,079 in Warehouse Line money either to himself or entities under his control. Also, the Debtor's principals inappropriately caused Warehouse Line proceeds to be used to fund the Debtor's operating expenses or for other purposes, despite the Debtor's representations that the money was being used to fund new loans.

Moreover, the Debtor did not always disburse as much money as it was supposed to, when it was supposed to, in order to pay off its customers' initial mortgage loans, and it did not often deposit into the Disbursement Accounts that portion of the refinancing money that was supposed to come from its own funds. The Debtor's actions in this regard created a "float" in the Disbursement Accounts, which the Debtor used to finance its business operations.

Furthermore, the Debtor often used Warehouse Line proceeds to pay "old" loans (which it falsely represented had already been paid with earlier Warehouse Line advances) rather than using it to fund new loans (as it falsely represented that it was doing). Additionally, Ashley diverted over $50 million of the Debtor's money for his own benefit, and/or for the benefit of his affiliated entities or relatives. The effect of all this was to create "an ever-increasing deficiency" in the Disbursement Accounts, relative to the Debtor's current loan funding obligations. Some of the refi-loans the Debtor originated were never funded, and thus Gateway was left with "title" to mortgages that were of little worth to it, since the original mortgagees were never paid. The foregoing activities led to indictments and convictions of certain of the Debtor's principals (including a guilty plea to criminal fraud by Helene DeCillis).

In time, Gateway came to need additional capital. Moreover, the U.S. Office of Thrift Supervision determined that Gateway needed to dispose of (or reclassify) certain "toxic assets."

Gateway also needed to rid itself of certain non-performing real estate in Manhattan. The Debtor, meanwhile (due in no small part to its foregoing improprieties), was in desperate need of cash. However, the Debtor could not obtain additional funding, because it was at or near the $100 million credit limit of the Warehouse Line, and no one else would lend to it.

Thus, the Debtor and Gateway struck a deal, defined as the "Gateway Funding Agreement," wherein Gateway promised: (1) To increase the credit limit in the Warehouse Line to $120 million and (2) provide the Debtor with certain loan servicing rights purported to be worth $50 million. In exchange, the Debtor promised to assist Gateway with/by: (1) Arranging for the purchase or other disposition of $15 million of non-performing real-estate-related assets (the "Toxic Assets"); (2) raising $6.7 million in capital through a sale of Gateway preferred stock; (3) purchasing certain Manhattan real estate (or Gateway's interest in it) from Gateway.

The Debtor performed its end of the Gateway Financing Agreement. First, the Debtor, in accordance with Gateway's request, transferred a total of $3,817,866.80 to various of its related entities, which then turned around and used the money to buy the Toxic Assets from Gateway. Second, the Debtor assisted Gateway in raising capital through a sale of its stock. In similar fashion to the sale of the Toxic Assets, the Debtor transferred a total of $6.752 million to related entities, which then turned around and used the money to purchase shares of Gateway stock from Gateway. The related entities took title to the stock, not the Debtor. Third, the Debtor transferred $800,000 for some purpose (unspecified in the complaint) relating to the sale of certain property in Manhattan, owned at least in part by Gateway.

Even though the Debtor kept its promises under the Gateway Funding Agreement, Gateway did not—which Gateway acknowledged in writing (the "Gateway Acknowledgment") at a meeting with the Debtor on September 1, 2009 (when the Debtor's need for funding had become dire). The Gateway Acknowledgment notes that time was of the essence with respect to

Gateway's promised performance, and it refers to the Debtor as "broker" for the foregoing

transactions, and to Gateway as the "beneficiary."

Gateway never increased the credit limit on the Warehouse Line, but reduced it to about

$50 million (less than the nearly $100 million already outstanding under the Warehouse Line).

Gateway never gave the Debtor the servicing rights as it promised. This was a substantial cause

of the Debtor's eventual demise (though the Trustee in other proceedings has represented that the

fraudulent scheme that the Debtor was effectuating collapsed under its own weight). At all

relevant times, the complaint alleges that the Disbursement Accounts lacked the funds necessary

to finance the Debtor's mortgage loans; the Debtor had insufficient money to meet its various

obligations; and the Debtor had insufficient capital to operate its business.

## Discussion

### I. The Standard for Granting a Motion to Dismiss under Fed. R. Civ. P. 12(b)(6).

Gateway moves to dismiss counts 1-8 and 13 of the complaint under Federal Rule of

Civil Procedure ("Federal Rule") 12(b)(6), incorporated by Federal Rule of Bankruptcy

Procedure ("Bankruptcy Rule") 7012(b), for failure to state a claim. The U.S. Supreme Court has

explained that,

> [u]nder Federal Rule of Civil Procedure 8(a)(2), a pleading
> must contain a "short and plain statement of the claim showing that
> the pleader is entitled to relief." As the Court held in *Twombly*, 550
> U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929, the pleading standard
> Rule 8 announces does not require "detailed factual allegations,"
> but it demands more than an unadorned, the-defendant-unlawfully-
> harmed-me accusation. Id., at 555, 127 S.Ct. 1955 (citing *Papasan
> v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209
> (1986)). A pleading that offers "labels and conclusions" or "a
> formulaic recitation of the elements of a cause of action will not
> do." 550 U.S., at 555, 127 S.Ct. 1955. Nor does a complaint suffice
> if it tenders "naked assertion[s]" devoid of "further factual
> enhancement." Id., at 557, 127 S.Ct. 1955.

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Id., at 570, 127 S.Ct. 1955. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Id., at 556, 127 S.Ct. 1955. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Ibid. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' " Id., at 557, 127 S.Ct. 1955 (brackets omitted).

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Moreover, the Court must accept as true all well-pled factual assertions in the complaint, but not mere legal conclusions. *Id.* at 678-679. At bottom, the factual allegations in the complaint, accepted as true, must *show,* not merely *allege,* that the plaintiff is entitled to the relief it is seeking. *See id.* at 679.

## II. Count 1—Breach of Contract

*A. Introduction*

Count 1, under a breach-of-contract theory, seeks more than $50 million in damages from Gateway on account of Gateway's non-performance of its promises under the Gateway Funding Agreement to increase the Warehouse Line credit limit from $100 million to $120 million, and to give the Debtor servicing rights worth $50 million.

In New York, the elements of a breach-of-contract claim are: (1) a contract exists between the parties; (2) the party asserting breach has rendered any due performance; (3) breach of the contract by the defendant; (4) damages resulting from the breach. *Campo v. 1st Nationwide Bank*, 857 F.Supp. 264, 270 (E.D.N.Y. 1994). Generally, "[w]hen performance of a duty under a contract is due any non-performance is a breach." Restatement (Second) of Contracts § 235(2). This standard is widely accepted as the proper standard for breach of contract. *See U.S. Fidelity and Guar. Co. v. Braspetro Oil Svc's Co.*, 369 F.3d 34, 53 (2d. Cir. 2004)(citing Restatement §

235(2) for the general standard for breach of contract); *N.Y. State Elec. & Gas Corp. v. State*, 218 A.D.2d 868, 870 (N.Y. 3d. Dep't 1995)(relying on Restatement § 235 to determine when non-performance constitutes a breach).

At first blush, the complaint seems to state a *prima facie* claim for breach of contract. The complaint alleges that Gateway asked the Debtor to assist it with disposing of the Toxic Assets, selling its stock, and selling the Manhattan property, and the Debtor agreed to do so in exchange for Gateway's aforementioned promises. This seems like classic offer, acceptance, and consideration by way of mutually-exchanged promises, giving rise to a valid contract. *See* Restatement (Second) of Contracts §§ 17-18, 22, 71, 75.

Here, the Gateway Acknowledgement specifies that "time is of the essence" with respect to Gateway's performance. Moreover, the complaint alleges that, while the Debtor fully performed its obligations, Gateway never did. The complaint admits that the Debtor breached its obligations under the agreement governing the Warehouse Line, in that it used the proceeds thereof for improper purposes, and then lied about it. However, the Warehouse Line agreement is an altogether separate agreement from the Gateway Funding Agreement. Thus, the complaint seems to state a plausible claim that Gateway failed to render performance when due and thereby breached the Gateway Funding Agreement, which caused damages. Therefore, the complaint states a claim for breach of contract.

### B. Summary of the parties' arguments

Nevertheless, Gateway argues that it is plain from the face of the complaint and other public documents that the Gateway Funding Agreement and the Gateway Acknowledgement cannot be enforced against Gateway, since they give rise to an illegal contract. Gateway refers *ad nauseum* to all of the foregoing deception, fraud, and illegality which the Debtor and its

principals perpetrated by way of misuse of loan proceeds from the Warehouse Line, as well as the false representations concerning the status of the Debtor's refi-loans.

Gateway also argues that its performance under the Gateway Funding Agreement would have provided the Debtor with funding to continue its illegal, fraudulent practices, and therefore would have contributed to the commission of a crime. Moreover, Gateway points out that the fraud and misappropriation constituted a crucial contributing factor to the Debtor's need for the increased financing, which was what motivated the Debtor to agree to perform under the Gateway Funding Agreement. Therefore, Gateway contends that the nexus between the Debtor's fraud and the Gateway Funding Agreement is so strong that Gateway's promises under the Gateway Funding Agreement ought to be rendered unenforceable as "part and parcel" of the Debtor's larger criminal enterprise. Gateway does not deny that the Gateway Funding Agreement was entered into by the Debtor and Gateway.

The Debtor responds that enforcement of the contract at issue here will not require the performance of an illegal act, and that it can be fully enforced and effectuated independently of the Debtor's fraud and misconduct. Standing on its own, the contract is a valid agreement, supported by valid consideration. Gateway is misguidedly trying to lift the fraud and deceit that permeated the Debtor's conduct with respect to the Warehouse Line and inject it into the Gateway Funding Agreement, which is a distinct transaction from the Warehouse Line. The two are only collaterally related to one another, which is insufficient to invalidate the Gateway Funding Agreement for illegality. The Debtor also appeals to equity, contending that Gateway has already received the benefit of the Debtor's promised performance under the contract. Therefore, Gateway would be unjustly enriched if its obligations were deemed unenforceable for illegality. Furthermore, any argument that the Debtor inevitably would have used the proceeds from the increased Warehouse Line for fraudulent purposes is pure speculation.

Gateway rejoins by repeating most of its earlier arguments, but adds that because the Debtor's activities were *malum in se* (inherently immoral or criminal),[2] and not merely *malum prohibitum* (analogous to a mere misdemeanor or relatively minor misbehavior, prohibited by the law but not inherently immoral),[3] the Court need not concern itself over whether Gateway would be unjustly enriched if permitted to retain the benefit of the Debtor's performance without tendering performance of its own. This is because *malum in se* behavior is so repugnant to public policy as to override the seeming inequity of the result Gateway seeks to obtain here.

### C. Analysis

New York's well-settled policy is that a contract may not be enforced where its purpose is illegal, or where the plaintiff sues for enforcement based on its own criminal or corrupt activity in the course of performing its end of the bargain—even if the contract itself is facially legal, and even though the defendant has received the benefit of its bargain and therefore might get a windfall if enforcement is denied. *See McConnell v. Commonwealth Pictures Corp.*, 7 N.Y.2d 465, 469-471 (N.Y. 1960).

*McConnel* (which seems to be the seminal New York case on the issue) adopted the standard for illegality set forth in Restatement of Contracts § 512, which provides that "[a] bargain is illegal… if either its formation or its performance is criminal, tortious, or otherwise opposed to public policy." *Prote Contr. Co. v. Board of Ed. Of the City of New York*, 230 A.D.2d 32, 40 (N.Y. 1st Term 1997). Moreover, if a party to a contract intends to use the other party's performance to harm a third party by deceiving or defrauding the third party, then the contract is illegal and unenforceable. Restatement of Contracts § 577.[4]

Moreover,

---

[2] Black's Law Dictionary (9th ed. 2009), *malum in se.*
[3] Black's Law Dictionary (9th ed. 2009), *malum prohibitum*.
[4] The Second Circuit has relied on this section of the Restatement of Contracts. *See Bankers Trust Co. v. Litton Systems, Inc.*, 599 F.2d 488, 493 (2d. Cir. 1979).

> [i]t is not every minor wrongdoing in the course of contract performance that will insulate the [defendant] from liability…. There must at least be a direct connection between the illegal transaction and the obligation sued upon. Connection is a matter of degree. Some illegalities are merely incidental to the contract sued on….

*Id.* at 471. *Accord* Restatement of Contracts § 597 (providing that "[a] bargain collaterally and remotely connected with an illegal purpose or act is not rendered illegal thereby if proof of the bargain can be made without relying upon the illegal transaction.") Indeed, the illegality must be "central to or a dominant part of the plaintiff's whole course of conduct in performance of the contract." *FCI Group, Inc. v. City of New York*, 54 A.D. 171, 177 (N.Y. 1st Term 2008)(internal quotes omitted).

Here, the complaint and related documents do not purport to show that the purpose of the Gateway Funding Agreement was illegal, that its very formation was illegal, that the Debtor did anything illegal in performing its obligations, or that the Debtor intended to use Gateway's performance to harm anyone. Gateway, as discussed, relies on the fact that the Debtor needed the additional funding because it was broke, due to its aforementioned bad conduct. Even so, all that really indicates is that the Debtor's misdeeds backed it into a financial corner. This motivated the Debtor to enter into the Gateway Funding Agreement in order to obtain much-needed cash. Accordingly, the Debtor's need for Gateway's performance under the Gateway Funding Agreement was a collateral consequence of prior illegality; this does not mean that the agreement is itself "directly connected" to that illegality.

Moreover, nothing in the complaint or related documents provided by Gateway alleges that the Debtor did anything illegal[5] in the course of performing its obligations under the

---

[5] The complaint does allege that most or all of the Debtor's transfers, made in connection with performing its obligations under the Gateway Funding Agreement, were constructive fraudulent transfers. However, it is not necessary to a constructive fraudulent transfer claim that anything be shown which amounts to the kind of

Gateway Funding Agreement. Nothing on the face of those documents indicates that it is more likely than not that the Debtor would have fraudulently misappropriated the increased funding rather than using it to fund new loans, as required, or that it would have done anything corrupt in connection with the $50 million loan servicing rights. Gateway *infers* these things based on subsequently-known facts—however, in a motion to dismiss, all inferences must be drawn in favor of the plaintiff. *Jeter v. New York City Dep't of Ed.*, 549 F.Supp.2d 295 (E.D.N.Y. 2008). It may be that, given the opportunity to present evidence, Gateway will be able to show a closer nexus between the Debtor's fraud and the Gateway Funding Agreement, sufficient to sustain a defense of illegality. However, such a defense is not apparent from the complaint and related documents. Therefore, Gateway's motion to dismiss count 1 of the complaint will be denied.

## III. Count 2—Breach of Fiduciary Duty

For the reasons discussed below, it seems that count 2, alleging that Gateway breached its fiduciary duties to the Debtor, should not be dismissed.

### A. Summary of the parties' arguments

The complaint alleges, in essence, that Gateway owed fiduciary obligations to the Debtor, because Gateway initially held itself out as having special prowess in the area of warehouse lending, and because, over time, the Debtor's dependence on Gateway to fund its business through the Warehouse line increased, giving rise to a relationship of peculiar dependence. The complaint also points out that certain principals of the Debtor were shareholders in Gateway, and that a merger between the two entities was discussed at length at some point. The complaint asserts that Gateway breached its fiduciary duties of care and loyalty to the Debtor and its creditors by (1) breaching its promises under the Gateway Funding Agreement; and (2) using the

---

malicious fraud or similar activity needed to sustain an illegality defense, whereas actual fraudulent transfer would sustain an illegality defense. *Cf.* Restatement of Contracts § 577, Illustration 6.

Debtor for its own self-dealing in connection with the disposal of the Toxic Assets, the sale of the aforementioned Gateway stock, and the purchase of the Manhattan property.

Gateway argues that, on the face of the complaint and related documents here, there exist no special circumstances establishing that the Debtor relied on Gateway to such a degree as to give Gateway the kind of overarching control that would create fiduciary obligations. Rather, the relationship between the Debtor and Gateway was nothing more than an arm's length, contractual relationship between two sophisticated financial institutions. Gateway also argues that the breach of fiduciary duty claim is duplicative of the breach of contract claim.

The Trustee responds that the unusual circumstances surrounding the relationship between the Debtor and Gateway did indeed give rise to a fiduciary relationship—i.e. the "substantial financial assistance" that the Debtor rendered to Gateway, plus the other factors mentioned in the complaint. Trustee argues that the fiduciary-relationship question cannot be decided by rigid formulas, but is a fact-specific inquiry that should be reserved for trial. Gateway essentially responds by accusing Trustee of ignoring relevant case law and trying to conjure a fiduciary relationship were none can possibly exist.

*B. Analysis*

As the New York Court of Appeals has explained,

> A fiduciary relationship arises "between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation" (*id*. [internal quotation marks and citation omitted]). Put differently, "[a] fiduciary relation exists when confidence is reposed on one side and there is resulting superiority and influence on the other" (*AG Capital Funding Partners, L.P. v State St. Bank & Trust Co.*, 11 NY3d 146, 158 [2008] [internal quotation marks and citation omitted]). Ascertaining the existence of a fiduciary relationship "inevitably requires a fact-specific inquiry" (*Eurycleia Partners, LP v Seward & Kissel, LLP*, 12 NY3d 553, 561 [2009]).

*Roni LLC v. Arfa*, 18 N.Y.3d 846, 848 (N.Y. 2011). Moreover, a fiduciary relationship is "grounded in a higher level of trust than normally present in the marketplace between those involved in arm's length business transactions." *EBC I, Inc. v. Goldman, Sachs & Co.*, 5 N.Y.3d 11, 19-20 (N.Y. 2005).

As it pertains to this motion, it is true that "there is generally no fiduciary obligation in a contractual arm's length relationship between a debtor and a note-holding creditor." *Oddo Asset Mgt. v. Barclays Bank PLC*, 19 N.Y.3d 584, 593 (N.Y. 2012)(internal quotes omitted). However, this rule

> is not without exception. In the rare circumstance where a creditor exercises such control over the decision-making processes of the debtor as amounts to a domination of its will, he may be held accountable for his actions under a fiduciary standard.

*See Matter of Teltronics Svc's, Inc.*, 29 B.R. 139 (Bankr. E.D.N.Y. 1983)(equitable subordination case discussing the standard for holding non-insider creditor to a fiduciary obligation). This is an extremely difficult showing to make. It generally requires proof that the creditor did more than merely engage in lawful activity to collect on its debt. Rather, it requires a showing that the creditor actively controlled, or participated in, the Debtor's entrepreneurial or business activities, to a degree reminiscent of the relationship between the Debtor and its corporate fiduciaries. *See id.*

Here, the Trustee argues that the Debtor reposed special trust and confidence in Gateway's self-asserted expertise in financial matters, was dependent on Gateway for its funding and payroll, and rendered substantial financial assistance to Gateway in return for various promises. Taking all of this as true, it could be inferred that Gateway had such *de facto* control over the Debtor that it in effect assumed the position of a corporate fiduciary.

Clearly, this is a matter to be determined on the basis of evidence, and not on a motion to dismiss under Federal Rule 12(b)(6). It must be borne in mind that what the Court is being called upon to decide is a motion to dismiss, where the non-moving party must be given every reasonable benefit of a doubt, consistent with *Iqbal*. *See Jeter v. New York City Dep't of Ed.*, 549 F.Supp.2d 295 (E.D.N.Y. 2008). Accordingly, it seems that the Trustee should be given an opportunity to conduct discovery and try to make this difficult showing, if he can. Therefore, count 2 will not be dismissed.

IV. <u>Count 3 (Promissory Estoppel); Count 13 (Unjust Enrichment)</u>

Count 3 of the complaint asserts a claim for promissory estoppel, and count 13 asserts a claim for unjust enrichment. For the reasons discussed below, it seems that neither of these counts should be dismissed.

*A. Summary of the parties' arguments*

As for promissory estoppel, the complaint asserts that the Debtor justifiably relied to its detriment on Gateway's promises to increase the Warehouse Line credit limit, and to provide it with valuable loan servicing rights, as a result of which the Debtor suffered significant damages. The complaint also asserts that Gateway will be unjustly enriched if it is permitted to retain the benefit of the Debtor's performance under the Gateway funding agreement without being held accountable for its own non-performance.

Gateway asserts that these claims ought to be dismissed as duplicative of the breach-of-contract claim asserted in count 1, since they rest on exactly the same allegations as count 1 without alleging any duty arising independently of the underlying contract. Gateway also argues that the doctrine of "unclean hands" and the "illegality" of the Gateway Funding Agreement (as addressed above) both bar the Trustee from recovering under these claims.

The Trustee responds that the claims of promissory estoppel and unjust enrichment are merely alternative theories of liability, which is consistent with the Federal Rules. Gateway essentially repeats its earlier arguments in further rejoinder.

*B. Analysis*

(1). <u>Duplicative claims</u>

Gateway cites one or two federal cases and multiple New York state cases in support of the proposition that, where a complaint bases quasi-contract allegations on essentially the same facts as a breach-of-contract allegation, the quasi-contract claims should be dismissed. *See, e.g. Underdog Trucking, LLC v. Verizon Svc's Corp.*, 2010 WL 2900048 (S.D.N.Y. 2010)(relying on New York state precedent to hold that a quasi-contract claim which relied on essentially the same allegations as a breach of contract claim should be dismissed as duplicative). The Trustee, by contrast, cites multiple federal cases in support of the notion that it is perfectly appropriate to plead quasi-contract theories as alternatives to a breach-of-contract claim. *See, e.g., Contractual Obligation Prods., LLC v. AMC Networks, Inc.*, 2006 U.S. Dist. LEXIS 16402, at *19-23 (S.D.N.Y. Mar. 31, 2006) (denying motion to dismiss promissory estoppel and quasi-contract claims as alternatives to breach of contract claim).

It is true under New York law that a party cannot ultimately maintain a promissory estoppel or unjust enrichment claim, where an express contractual agreement governs the same subject matter, between the same parties. *See Bridgeway Corp. v. Citibank, N.A.*, 132 F.Supp.2d 297, 305 (S.D.N.Y. 2001). Even so, since we are in federal court, the issue of whether the complaint may properly assert claims for both breach of contract and quasi contract must be decided with reference to the Federal Rules of Civil Procedure.  *See Hanna v. Plumer*, 380 U.S. 460, 463-474 (1965). Federal Rule 8(d)(3) provides that "[a] party may state as many separate claims or defenses as it has, regardless of consistency." Moreover, Federal Rule 8(d)(2) provides

that "[a] party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient." These rules reflect that the Federal Rules were meant to give the plaintiff "wide latitude" in framing its right to recover. *Bridgeway Corp.*, 132 F.Supp.2d at 305.

Thus, many federal *and* New York cases have permitted parties to plead both breach-of-contract and quasi-contract claims in the alternative, despite the internal inconsistency of such pleading—at least where, as here, there was a dispute as to the validity of the underlying contract, leaving open the possibility that the plaintiff might need to rely on the quasi-contractual theories in order to recover anything, should the actual contract fall. *See Seiden Assoc's v. ANC Holdings, Inc.*, 754 F.Supp. 37, 40 (S.D.N.Y. 1991)(noting that "alternative pleading of contradictory claims is explicitly allowed under the Federal Rules of Civil Procedure").

There seems to have been no dispute as to the validity of the underlying contract in the one federal case that Gateway cites in support of dismissing the quasi-contract claims here as duplicative, namely *Underdog Trucking, supra*. It seems perfectly consistent with the Federal Rules to dismiss equitable claims that rest on precisely the same allegations as a breach-of-contract claim where no one disputes the contract's validity. That is because, if no one disputes the validity of the contract, then the case at large will proceed as if the contract is valid. Again, if there is a valid contract covering the same parties and subject matter as the quasi-contract claims, then under no set of facts may the plaintiff recover under the quasi-contract claims, making dismissal of the quasi-contract claims appropriate. *Compare Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.E.2d 190 (N.Y. 1987)(noting that '[i]t is impermissible…to seek damages in an action sounding in quasi contract where the suing party has fully performed on a valid written agreement, *the existence of which is undisputed*, and the scope of which clearly covers

15

the dispute between the parties")(emphasis added) *with Bridgeway Corp.*, 132 F.Supp.2d at 305 (noting that "[b]ecause there is a dispute as to defendant's obligations under the contract, however, plaintiff's unjust enrichment claim survives, although solely as an alternative to the breach of contract claim.") *See also Fantozzi v. Axsys Technologies, Inc.*, 2008 U.S. Dist. LEXIS 94040 at *21-22 (S.D.N.Y. 2008)(deciding a summary judgment motion, noting that "[t]he law in New York is that a party may assert causes of action in both breach of contract and quasi-contract where there is a bona fide dispute concerning existence of a contract or whether the contract covers the dispute in issue…."). Therefore, because Gateway disputes the validity of the Gateway Funding Agreement on the basis of illegality, the Trustee may plead the equitable claims as alternative theories, so that counts 3 and 13 should not be dismissed as duplicative.

(2). Unclean Hands/Illegality

The doctrine of "unclean hands" is an equitable maxim that denies equitable relief (such as "unjust enrichment" or "promissory estoppel") to a party who has engaged in "unlawful, unconscionable or inequitable conduct in the matter with relation to which he seeks relief." *Eastman Kodak Co. v. Schwartz*, 133 N.Y.S.2d 908, 925 (N.Y. Sup. Ct. 1954). This holds true even though equitable relief would be warranted absent the bad conduct of the party seeking it. *See Wolfenstein v. Fashion Originators' Guild of America*, 544 A.D. 656, 660 (N.Y. 1st Dept. 1935). However, "unclean hands" does not bar a plaintiff from equitable relief merely because the plaintiff is generally a lawbreaker or of bad character. *Id.* at 660. Rather, the misconduct upon which an "unclean hands" defense is predicated must be directly connected with the subject matter of the litigation, and not merely collateral to it (and the party invoking "unclean hands" must have been injured by the conduct). *See A.H. Emery Co. v. Marcan Products Corp.*, 389 F.2d 11, 18 (2d. Cir. 1968)(quoting *Republic Molding Corp. v. B. W. Photo Utilities*, 319 F.2d 347, 349 (9th Cir. 1963)(observing that "[m]isconduct in the abstract, unrelated to the claim to

which it is asserted as a defense, does not constitute unclean hands"); *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 842 F.Supp.2d 682, 712-713 (S.D.N.Y. 2012)(internal quotes omitted)(observing that if "the alleged misconduct is unrelated to the claim to which it is asserted as a defense, [it] does not constitute unclean hands.")

Here, it is beyond cavil that the Debtor and/or its officers engaged in unlawful and inequitable conduct by, *inter alia*, fraudulently misappropriating the Warehouse Line proceeds. Moreover, there is no question that Gateway was injured by this conduct. Nevertheless (for reasons similar to those discussed *supra* in connection with the illegality defense), at most this activity is collaterally-related to the particular transaction out of which the Trustee is suing Gateway. Such a connection is too attenuated and indirect to sustain a defense of unclean hands in this motion to dismiss. *See EEOC v. Bay Ridge Toyota, Inc.*, 327 F.Supp.2d 167, 172-173 (E.D.N.Y. 2004)(internal quotes omitted); *accord Seagirt Realty Corp. v. Chazanof*, 13 N.Y.2d 282, 286-287 (N.Y. 1963)(noting that unclean hands "must be applied only where the plaintiff has dealt unjustly in the very transaction of which he complains.")

It may be that Gateway will be able to make out an "unclean hands" defense once the parties have had a chance to conduct discovery. However, as of now, the allegations in the complaint and related documents do not give rise to an "unclean hands" defense, where all ambiguities and inferences must be drawn in favor of the plaintiff. *Jeter v. New York City Dep't of Ed.*, 549 F.Supp.2d 295 (E.D.N.Y. 2008). Therefore, the motion to dismiss counts 3 and 13 will be denied.

### V. Count 4—Breach of the Implied Covenant of Good Faith and Fair Dealing

Count 4 of the complaint alleges that Gateway breached the implied covenant of good faith and fair dealing (the "Implied Covenant"). For the reasons below, this count will not be dismissed.

*A. Introduction*

The Implied Covenant cannot exist *without* a valid contract between the parties, since it "is intended to serve in aid and furtherance of other [express] terms of the agreement…." *TVT Records v. Island Def Jam Music Grp.*, 244 F.Supp.2d 263, 277-78 (S.D.N.Y. 2003)(internal quotes omitted). A claim for breach of the Implied Covenant arises "only where one party's conduct, though not breaching the terms of the contract in a technical sense, nonetheless deprived the other party of the benefit of its bargain…." *Id.* at 278. In other words, the Implied Covenant protects a party against conduct that, though it does not violate the letter of the contract, violates the spirit. *See* Restatement (Second) of Contracts § 205, comment a (noting that "[g]ood faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party…").

*B. Summary of the parties' arguments*

The complaint asserts that Gateway breached the Implied Covenant by using the Debtor for its own self-dealing in connection with the Debtor's role in the sale of the Toxic Assets, the Manhattan property, and the Gateway stock, and it failed to provide the Debtor with the benefits promised under the Gateway Funding Agreement and the Gateway Acknowledgment. This caused the Debtor to suffer damages other than the consideration Gateway promised but never delivered.

 In support of dismissal, Gateway essentially argues that the allegations of breach of the Implied Covenant are based on the same allegations as the breach-of-contract claim, and are therefore duplicative and warrant dismissal. Gateway asserts that the Implied Covenant is entirely derivative of, and dependent upon, the existence of the contract, and imparts no right to recovery in addition to the rights provided under the contract. Thus, where breach of contract is

alleged, a claim for breach of the Implied Covenant based on precisely the same factual allegations adds nothing new or different, and should therefore be dismissed.

The Trustee responds that it is entirely appropriate for him to plead breach of the Implied Covenant as an alternative theory of recovery, under the principles discussed *supra* in connection with the claims for promissory estoppel and unjust enrichment. Gateway rejoins that the underlying contract was illegal, and that there was therefore no Implied Covenant to breach, since such a covenant is dependent on the existence of a valid contract.

*C. Analysis*

With respect to Gateway's "duplicative" argument, the applicable law is similar to the principles discussed *supra* with respect to promissory estoppel and unjust enrichment— ultimately, a party cannot recover on a claim for breach of the Implied Covenant where it rests on the same allegations and subject matter as a breach of contract claim. *Net2Globe Int'l, Inc. v. Time Warner Telecom of N.Y.*, 273 F.Supp.2d 436, 467 (S.D.N.Y. 2003). However, as with promissory estoppel and unjust enrichment, courts have permitted parties to plead a claim for breach of the implied covenant as an alternative to a breach-of-contract claim, at least where the meaning or validity of the contract is disputed, concerning the subject matter of the Implied-Covenant claim. *See Hard Rock Café Int'l, Inc. v. Hard Rock Hotel Holdings, LLC*, 808 F.Supp.2d 552, 567 (S.D.N.Y. 2011). Accordingly, for reasons similar to those discussed *supra* with respect to the promissory estoppel and unjust enrichment claims, it is appropriate to permit count 4 to survive dismissal, albeit as an alternative to the primary breach of contract claim.

Moreover, at this early stage, it is inappropriate to dismiss count 4. Count 4 alleges, among other things, that Gateway used the Debtor for its own benefit and to the Debtor's detriment. Drawing every possible inference favorably to the Trustee, the Court may infer from these allegations that Gateway did something which, while not a technical breach of the various

agreements, deprived the Debtor of the essential benefit of its bargain. Accordingly, count 4 will not be dismissed.

VI. <u>Counts 5-8—Fraudulent Transfer</u>

Counts 5-8 of the complaint allege fraudulent transfer in connection with the sale of the Toxic Assets, based on 11 U.S.C. §§ 544, 548, and various provisions of New York's Debtor and Creditor Law. The complaint seeks a total of $4,336,065.10 in connection with the fraudulent transfer claims, but Gateway only seeks dismissal of these claims to the extent of the first $3.65 million, with the remainder to be dealt with in a later motion for summary judgment or at trial.

*A. Summary of the parties' arguments*

Gateway argues that it is apparent from the face of the complaint that the Debtor never had an interest in the $3.65 million, since with respect to those funds it was merely a conduit in a larger, multi-step transaction initiated by Gateway for the benefit of Gateway, and the Debtor never had sufficient control over the funds to have ownership of them.

The complaint makes reference to a certain loan over which the Debtor and Gateway had some litigation against one another in the District Court. The complaint alleges that Gateway knowingly, falsely represented to the District Court that the Debtor applied for (and Gateway approved) a loan of $3.65 million (the "Commercial Loan"), and then breached the loan agreement, causing damages to Gateway. The complaint alleges that the Commercial Loan concerned a transaction that Gateway requested from the Debtor for Gateway's own benefit. Namely, in connection with the Commercial Loan *and* the sale of the Toxic Assets, Gateway requested and received $3.65 million from the Debtor for its own benefit. The complaint also alleges that the Debtor, on Gateway's request, transferred over $3.8 million in cash to its insiders, who then turned around and used that money to buy the Toxic Assets from Gateway.

Based upon these allegations, Gateway argues that the source of the disputed $3.65 million was Gateway itself; Gateway says that these allegations "clearly" indicate that Gateway lent the $3.65 million to the Debtor under the aforementioned Commercial Loan, which the Debtor then transferred to its insiders, who then gave the money back to Gateway in exchange for the Toxic Assets. Thus, since Gateway essentially paid itself with its own money using the Debtor as an intermediary in a multi-step transaction for its own benefit, and since the Debtor was operating at Gateway's direction and thus had no real "control" over the funds, the funds were never its property and hence could not constitute the subject of a fraudulent transfer.

Gateway also refers to the Gateway Acknowledgment, which refers to the Debtor as a "broker" and Gateway as a "beneficiary" with respect to, *inter alia*, the sale of the Toxic Assets. Citing Black's Law Dictionary, Gateway asserts that in common parlance a "broker" is a disinterested intermediary; thus, the Debtor could not have had an actual interest in the funds transferred with respect to the sale of the Toxic Assets as a "disinterested intermediary."

The Trustee disputes Gateway's reading of the complaint, in essence saying that the Complaint does not assert what Gateway says it does, and stating that, regardless how the Debtor came into possession of the $3.65 million, the funds were the Debtor's property since the Debtor had full control over their disposition. Accordingly, since Gateway has not shown that the Toxic Assets were bought with its money, and has not traced its interest in specific funds, it has failed to show that the funds were not the Debtor's property.

Gateway responds that it does not need to trace its interest in the specific funds, because the law is clear that the Debtor only "owns" funds over which it has control, or where the money is applied in a transaction motivated by the Debtor's own interests. Since the Debtor was just acting as an intermediary or a conduit for the laundering of Gateway's money back to Gateway

in connection with the sale of the Toxic Assets, the Debtor never had an interest in the funds, which could therefore not be the subject of a fraudulent transfer.

   *B. Analysis*

   Gateway makes a lot of technical legal arguments in addition to what is set forth above (to which the Trustee responds with his own technical arguments), but they all rest on the foregoing assertion that the complaint "clearly" alleges that the Debtor essentially laundered Gateway's own money back to it.

   Nevertheless, this core premise of Gateway's argument is not clear from the face of the complaint and related documents. Nowhere does the Complaint expressly state that the Debtor actually borrowed or otherwise obtained the $3.65 million from Gateway under the terms of (or in connection with) the Commercial Loan. The complaint makes no express allegations whatsoever with respect to the source of the funds that the Debtor transferred in order to facilitate the insiders' purchase of the Toxic Assets. Rather, it alleges that Gateway *falsely represented* to the District Court that the Debtor applied for, and Gateway approved, the Commercial Loan. It also alleges some sort of relationship between the sale of the Toxic Assets and the Commercial Loan. It further alleges that *Gateway* obtained $3.65 million *from the Debtor* in connection with the Commercial Loan and the Toxic Asset sale, and that the Debtor *agreed* to facilitate the sale of the Toxic Assets *in exchange for* an increased credit limit and valuable loan servicing rights. These allegations seem to fall short of a situation where the complaint specifically alleges that the Debtor laundered Gateway's own money back to it.

   Gateway's interpretation is, at the very most, one possible inference that can be gleaned from the allegations in the complaint. However, another possible inference is that the Debtor transferred $3.65 million of its own money to the insiders at Gateway's request. Again, the Court

must draw all inferences in favor of the plaintiff, not the moving party. *Jeter v. New York City Dep't of Ed.*, 549 F.Supp.2d 295 (E.D.N.Y. 2008).

It may be that, given an opportunity to conduct discovery, Gateway will be able to show that the funds used to facilitate the sale of the Toxic Assets were not the Debtor's property, but that is by no means "clear" from the face of the complaint and related documents. Therefore, the motion to dismiss is denied as to counts 5-8 of the complaint.

### <u>Conclusion</u>

The Trustee commenced this adversary proceeding on December 21, 2012. Gateway, relying on Federal Rule of Civil Procedure 12(b)(6), brought this pre-answer motion to dismiss. The allegations by the Trustee are adequately pled. All of these allegations by the Trustee are to be determined after an evidentiary hearing requiring evidence. For the reasons cited herein, the motion to dismiss is denied as to counts 1, 2, 3, 4, 5-8 and 13.

Gateway shall serve and file its answer by January 14, 2014. The Court will issue a separate order, in conformity with this Memorandum.

**Dated: Central Islip, New York**
**December 23, 2013**

**Dorothy Eisenberg**
**United States Bankruptcy Judge**